**RIVERSIDE IRRIGATION DISTRICT and Public Service Company of Colorado, Plaintiffs-Appellants,**

**and**

**Cache La Poudre Water Users Association; Northern Colorado Water Conservancy District; Colorado Water Congress; National Water Resources Association, Colorado River Water Conservation District; Southwestern Water Conservation District; Lower South Platte Water Conservation District, and State of Colorado, Plaintiffs-Intervenors-Appellants,**

**v.**

**Colonel William R. ANDREWS, Jr., in his official capacity as District Engineer of the U.S. Army Corps of Engineers, Omaha District, Defendant-Appellee,**

**and**

**National Wildlife Federation, Defendant-Intervenor-Appellee.**

**Nos. 83–2114, 83–2115, 83–2219 and 83–2230.**

United States Court of Appeals, Tenth Circuit.

March 26, 1985.

Timothy J. Flanagan, Denver, Colo. (James R. McCotter, Denver, Colo., on brief), Kelly, Stansfield & O'Donnell, Denver, Colo. (Bryant O'Donnell, Denver, Colo., on brief), for plaintiffs-appellants.

Wendy C. Weiss, Asst. Atty. Gen., Denver, Colo. (Duane Woodard, Atty. Gen., Denver, Colo., on brief), for plaintiff-intervenor-appellant State of Colo.

John M. Sayre, Gregory J. Hobbs, Jr., and Jeffrey C. Fereday of Davis, Graham & Stubbs, Denver, Colo., on brief, for plaintiff-intervenor-appellant Northern Colo. Water Conservancy Dist.

Ward H. Fischer, Fort Collins, Colo. (James E. Ringenberg and William R. Fischer, Fort Collins, Colo., on brief), Fischer, Brown, Huddleson & Gunn, Fort Collins, Colo., for plaintiff-intervenor-appellant Cache La Poudre Water Users Ass'n.

Constance E. Brooks, Denver, Colo., on brief, for plaintiffs-intervenors-appellants Colorado Water Congress and Nat. Water Resources Ass'n.

Myles Flint, Dept. of Justice, Washington, D.C. (F. Henry Habicht, II, Asst. Atty. Gen., Fred R. Disheroon, Sp. Litigation Counsel, Peter R. Steenland, Jr., and Anne S. Almy, Dept. of Justice, Washington, D.C., and John R. Hill, Jr., Dept. of Justice, Denver, Colo., on brief), for defendant-appellee Colonel William R. Andrews, Jr.

Jerry L. Jackson, Washington, D.C., for defendant-intervenor-appellee Nat. Wildlife Federation.

Before McKAY and LOGAN, Circuit Judges, and RUSSELL, District Judge [*].

McKAY, Circuit Judge.

The issue in this case is whether the Corps of Engineers exceeded its authority when it denied plaintiffs a nationwide permit for deposit of dredge material for construction of Wildcat Dam and Reservoir. The Corps based its decision on the poten-

[*] Honorable David L. Russell, United States District Judge for the Districts of Oklahoma, sitting by designation.

tial downstream impact on an endangered species due to the resulting increased consumptive use of water.

Plaintiffs seek to build a dam and reservoir on Wildcat Creek, a tributary of the South Platte River. Because construction of the dam involves depositing dredge and fill material in a navigable waterway,[1] the plaintiffs are required to obtain a permit from the Corps of Engineers under Section 404 of the Clean Water Act, 33 U.S.C. § 1344. The regulations under the Clean Water Act create categories of nationwide permits that provide automatic authority to place fill material if certain conditions are met. 33 C.F.R. § 330.4. If the conditions are not met, the party must seek an individual permit through a public notice and hearing process. The Corps determined that the proposed deposit did not meet the required conditions because the increased use of water that the resulting reservoir would facilitate would deplete the stream flow and endanger a critical habitat of the whooping crane, an endangered species. The Corps therefore informed the plaintiffs that they would be required to obtain an individual permit before the project could proceed.

Plaintiffs filed this suit seeking declaratory and injunctive relief and review of the agency action, claiming that the project is entitled to proceed under a nationwide permit and that the Corps exceeded its authority when it considered the effect of depletions caused by consumptive use of the water to be stored in the reservoir. An interlocutory appeal was taken from the district court's decision denying the government's motion to dismiss for lack of jurisdiction. This court affirmed the trial court, and remanded "for a determination whether the Engineer acted within his authority and to resolve whatever issues may remain." *Riverside Irrigation District v. Stipo*, 658 F.2d 762, 768 (10th Cir.1981).

On remand, the district court held that the engineer had acted within his authority and that he was required, under the Clean Water Act and the Endangered Species Act, to deny the nationwide permit. Plaintiffs appeal.

■ A nationwide permit is one covering a category of activities occurring throughout the country that involve discharges of dredge or fill material that will cause only minimal adverse effects on the environment when performed separately and that will have only minimal cumulative effects. *See* 33 U.S.C. § 1344(e)(1). Such a permit is automatic in that if one qualifies, no application is needed before beginning the discharge activity. *Riverside Irrigation District v. Andrews*, 568 F.Supp. 583, 585 (D.Colo.1983). The Corps has the authority and duty, however, to ensure that parties seeking to proceed under a nationwide permit meet the requirements for such action. One condition of a nationwide permit is that the discharge not destroy a threatened or endangered species as identified under the Endangered Species Act, or destroy or adversely modify the critical habitat of such species. 33 C.F.R. § 330.-4(b)(2).[2] The regulations thus are consistent with the Corps' obligation, under the Endangered Species Act, to ensure that "any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical." 16 U.S.C. § 1536(a)(2).

No one claims that the fill itself will endanger or destroy the habitat of an endangered species or adversely affect the aquatic environment. However, the fill that the Corps is authorizing is required to build the earthen dam. The dam will result

1. We assume, for purposes of this appeal, that Wildcat Creek is a navigable waterway as defined in the Clean Water Act. While plaintiffs claim to have reserved the right to argue this point in later proceedings, they have not argued the point before this court.

2. When the suit began, the relevant regulation was 33 C.F.R. § 323.4–2. The Corps promulgated revised regulations during the remand to the district court. Plaintiffs do not argue that the revision had any impact on the issues in this case. Brief for Riverside at 9, n. 3.

in the impoundment of water in a reservoir, facilitating the use of the water in Wildcat Creek. The increased consumptive use will allegedly deplete the stream flow, and it is this depletion that the Corps found would adversely affect the habitat of the whooping crane.

■ The Endangered Species Act does not, by its terms, enlarge the jurisdiction of the Corps of Engineers under the Clean Water Act. *Riverside Irrigation District,* 568 F.2d at 588; *cf. United States v. Stoeco Homes, Inc.,* 498 F.2d 597, 607 (3d Cir. 1974) (federal environmental statutes do not enlarge the Corps' jurisdiction under the Rivers and Harbors Appropriations Act). However, it imposes ˙on agencies a mandatory obligation to consider the environmental impacts of the projects that they authorize or fund. As the Supreme Court stated in *TVA v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978):

> One would be hard pressed to find a statutory provision whose terms were any plainer than those of § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies "to *insure* that actions *authorized, funded or carried out* by them do not jeopardize the continued existence" of an endangered species or "result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536. This language admits of no exception.

(emphasis in original). The question in this case is how broadly the Corps is authorized to look under the Clean Water Act in determining the environmental impact of the discharge that it is authorizing.

■ Plaintiffs claim that the Corps is authorized to consider only the direct, on-site effects of the discharge, particularly the effects on water quality, and that the Corps exceeded its authority by considering downstream effects of changes in water quantity. However, both the statute and the regulations authorize the Corps to consider downstream effects of changes in water quantity as well as on-site changes in water quality in determining whether a proposed discharge qualifies for a nation-

wide permit. The statute explicitly requires that a permit be obtained for any discharge "incidental to any activity having as its purpose bringing an area of navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters reduced." 33 U.S.C. § 1344(f)(2). The guidelines for determining compliance with section 404(b)(1), developed by the Secretary of the Army and the Environmental Protection Agency, require the permitting authority to consider factors related to water quantity, including the effects of the discharge on water velocity, current patterns, water circulation, and normal water fluctuations. 40 C.F.R. §§ 230.23, 230.24. Thus, the statute focuses not merely on water quality, but rather on all of the effects on the "aquatic environment" caused by replacing water with fill material. 33 U.S.C. § 1344(f)(1)(E). *Minnehaha Creek Watershed District v. Hoffman,* 597 F.2d 617, 627 (8th Cir.1979).

■ Plaintiffs argue that, even if the Corps can consider effects of changes in water quantity, it can do so only when the change is a direct effect of the discharge. In the present case, the depletion of water is an indirect effect of the discharge, in that it results from the increased consumptive use of water facilitated by the discharge. However, the Corps is required, under both the Clean Water Act and the Endangered Species Act, to consider the environmental impact of the discharge that it is authorizing. To require it to ignore the indirect effects that result from its actions would be to require it to wear blinders that Congress has not chosen to impose. The fact that the reduction in water does not result "from direct federal action does not lessen the appellee's duty under § 7 [of the Endangered Species Act]." *National Wildlife Federation v. Coleman,* 529 F.2d 359, 374 (5th Cir.1976). The relevant consideration is the total impact of the discharge on the crane. *Id.* at 373. In *National Wildlife Federation,* the Fifth Circuit held that the federal agency was required to consider both the direct and the

indirect impacts of proposed highway construction, including the residential and commercial development that would develop around the highway interchanges. Similarly, in this case, the Corps was required to consider all effects, direct and indirect, of the discharge for which authorization was sought.

■ The cases cited by the plaintiffs to the contrary are not controlling. Each involves the National Environmental Protection Act (NEPA), which authorizes the government to look at environmental concerns only when there is *"major* federal action." 42 U.S.C. § 4332(2)(C) (1976). Thus, in each, the question is whether the project is sufficiently federal to require an environmental impact statement at all. The Clean Water Act does not require major federal action before the Corps must consider environmental impacts. Rather, the Corps must consider the environmental impact of each act that it authorizes, both major and minor. In creating categories of nationwide permits, the Corps has "acted" to authorize discharges. Thus, simply allowing a party to proceed under the nationwide permit is an action by the Corps triggering its obligation to consider environmental impacts.

There is no authority for the proposition that, once it is required to consider the environmental impact of the discharge that it is authorizing, the Corps is limited to consideration of the direct effects of the discharge. The reduction of water flows resulting from the increased consumptive use *is* an effect, albeit indirect, of the discharge to be authorized by the Corps. The discharge thus may "destroy or adversely modify" the critical habitat of an endangered species, and the Corps correctly found that the proposed project did not meet the requirements for a nationwide permit.

■ Plaintiffs claim that the Corps cannot deny them a nationwide permit because the denial impairs the state's right to allocate water within its jurisdiction, in violation of section 101(g) of the Act (the "Wallop Amendment").[3] Even if denial of a nationwide permit is considered an impairment of the state's authority to allocate water, a question that we do not decide, the Corps acted within its authority. As discussed above, the statute and regulations expressly require the Corps to consider changes in water quantity in granting nationwide permits. Section 101(g), which is only a general policy statement, "cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly stated purpose." *Connecticut Light and Power Co. v. Federal Power Commission,* 324 U.S. 515, 527, 65 S.Ct. 749, 754, 89 L.Ed. 1150 (1945). Thus, the Corps did not exceed its authority in denying a nationwide permit based on its determination that the depletion in water flow resulting from increased consumptive use of water would adversely affect the critical habitat of the whooping crane.

■ The Wallop Amendment does, however, indicate "that Congress did not want to interfere any more than necessary with state water management." *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 178 (D.C.Cir.1982). A fair reading of the statute as a whole makes clear that, where both the state's interest in allocating water and the federal government's interest in protecting the environment are implicated, Congress intended an accommodation. Such accommodations are best reached in the individual permit process.

We need not reach the question raised by plaintiffs of whether Congress can unilaterally abrogate an interstate compact. The action by the Corps has not denied Colorado its right to water use under the South

3. The Wallop Amendment provides that:
It is the policy of Congress that the authority of each State to allocate water within its jurisdiction shall not be superseded, abrogated or otherwise impaired by this Act. It is the fur-

ther policy of Congress that nothing in this Act shall be construed to supersede or abrogate rights to quantities of water which have been established by any State.
33 U.S.C. § 1251(g) (1982).

Platte River Compact. All that has been done is to deny them the ability to proceed under a nationwide permit and to require them to apply for an individual permit under public notice and hearing procedures. As plaintiffs may receive an individual permit and be able to proceed with the project, a decision on the question of the impact of the interstate compact would be premature.

 We also need not decide whether the project will, in fact, have an adverse impact on the habitat of the whooping crane. Plaintiffs are entitled to proceed under a nationwide permit only if they can show that they meet the conditions for such a permit. Thus, plaintiffs must show "that the discharge *will not* destroy a threatened or endangered species as identified in the Endangered Species Act or destroy or adversely modify the critical habitat of such species." 33 C.F.R. § 330.-4(b)(2). The record supports the Corps' finding that the discharge may adversely modify the critical habitat of the whooping crane. Thus, plaintiffs did not meet their burden of showing, as a matter of fact, that the discharge will not have such an adverse impact. The Corps acted within its authority in requiring the plaintiffs to proceed under the individual permit procedure.

AFFIRMED.