PIERCE DOWNER'S HERITAGE ALLIANCE *et al.*, Plaintiffs-Appellants, v. THE VILLAGE OF DOWNERS GROVE *et al.*, Defendants-Appellees.

Second District    No. 2—98—0170

Opinion filed December 22, 1998.

BOWMAN, J., specially concurring in part and dissenting in part.

James A. Vroman, Christina M. Landgraf, Steven M. Siros, and Karen C.

Bruntrager, all of Jenner & Block, of Chicago, and James H. Knippen, of Walsh, Knippen, Knight & Diamond, Chartered, of Wheaton, for appellants.

Daniel P. Blondin, of Downers Grove, for appellee Village of Downers Grove.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and A. Benjamin Goldgar and John P. Schmidt, Assistant Attorneys General, of counsel), for appellees Department of Natural Resources and Illinois Health Facilities Planning Board.

Tracy D. Kasson and John R. Zemenak, both of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellees Advocate Health and Hospital Corporation and Citadel Properties Oak Brook L.L.C.

PRESIDING JUSTICE GEIGER delivered the opinion of the court:

The plaintiffs, Pierce Downer's Heritage Alliance, John Banaszak, Wayne Lela, and Albert Rouffa (collectively, Alliance), appeal from the November 7, 1997, order of the circuit court of Du Page County dismissing their complaint seeking an order of *mandamus*. In its complaint, Alliance sought to compel defendants the Village of Downers Grove (Village) and the Illinois Health Facilities Planning Board (Board) to engage in an environmental consultation with the Illinois Department of Natural Resources (IDNR) pursuant to section 17 of the Illinois Natural Areas Preservation Act (the Act) (525 ILCS 30/17 (West 1996)). Alliance argued that such a consultation was required before the Village and the Board could approve the construction and operation of a private health facility located on a site adjacent to Lyman Woods, which is an area protected under the Illinois Natural Areas Inventory (Inventory) (see 525 ILCS 30/17 (West 1996)). We affirm.

The facts relevant to the disposition of this appeal are as follows. The Advocate Health and Hospital Corporation (Advocate) owns and operates Good Samaritan Hospital located in Downers Grove. The hospital complex is located on 70 acres of land, approximately half of which have been developed. The southern, developed portion of the site contains the hospital, parking decks, office buildings, a retirement housing complex, roads, and other improvements. The northern portion of the site is undeveloped and consists of wetlands and an oak savanna.

The northern portion of the property is adjacent to Lyman Woods. Lyman Woods is an area of land protected under the Inventory pursuant to the regulations promulgated by the IDNR. See 17 Ill. Adm.

Code § 4010.110 *et seq.* (1996). Lyman Woods contains a hickory oak savanna and a wetlands area. Apparently, the type of natural area contained in Lyman Woods is rare and represents less than one-tenth of one percent of the total land and water surface area of Illinois.

In 1996, Advocate commenced plans for the construction of a "Wellness Center" on the undeveloped, northern portion of its hospital property. The project included a 100,145-square-foot, four-story building containing a health club, community education center, physicians' offices, outpatient physical therapy center, and other facilities. The project was also to include a stormwater detention pond and a parking lot for 385 cars. The proposed Wellness Center would occupy 8.22 acres. Advocate applied to the Village for a modification of its planned development to permit the construction of the Wellness Center. Advocate also applied to the Board for a certificate of need pursuant to sections 5 and 6 of the Illinois Health Facilities Planning Act (20 ILCS 3960/5, 6 (West 1996)).

On May 6, 1996, Advocate requested a consultation with the IDNR pursuant to section 11 of the Illinois Endangered Species Protection Act (the Protection Act) (520 ILCS 10/11 (West 1996)). The IDNR subsequently expanded this consultation with Advocate to include a consultation pursuant to section 17 of the Act; under the Act, the consultation procedure requires state and local governmental agencies to meet with the IDNR in order to evaluate the environmental consequences of any action that is "authorized, funded, or carried out" by the agency or local government (525 ILCS 30/17 (West 1996)). If the proposed action is found to have an adverse environmental impact, then the agency must "determine possible methods of eliminating or mitigating the adverse impact" and must attempt to eliminate or mitigate the impact in a manner consistent with the planned action. 525 ILCS 30/17 (West 1996).

On September 25, 1996, Advocate submitted a written report to the IDNR detailing the proposed project. See 17 Ill. Adm. Code § 1075.40(a) (1996). Also on September 25, 1996, Advocate met with IDNR representatives on the site. On October 25, 1996, the IDNR sent Advocate a letter detailing its recommendations to mitigate the environmental threats posed by the project. Among these recommendations, the IDNR proposed a cooperative plan between Advocate and the Downers Grove Park District for the management of the wetlands adjacent to the Wellness Center. The IDNR also recommended the construction of a parking deck, as opposed to a parking lot, for the Wellness Center.

On November 4, 1996, Advocate sent the IDNR a response to the recommendations. Advocate agreed to explore the IDNR's recommen-

dation to enter into an agreement with the Downers Grove Park District for the management of the wetlands on the property. However, Advocate declined to alter its plans for the parking lot, noting that the construction costs for a parking deck would be prohibitive.

On November 13, 1996, the IDNR sent a reply to Advocate's response. Although the IDNR indicated its regret over Advocate's decision regarding the parking lot, it nonetheless stated its belief that the consultation had "been successful in minimizing adverse impacts to the Lyman Woods Preserve, while recognizing the project [would] inevitably alter the structure and functions of its woodland community." The IDNR also indicated that the consultation was "closed." The Village was sent copies of all of the correspondence between Advocate and the IDNR relating to the consultation and therefore had notice that the consultation was taking place.

Back in September 1978, the Village had originally approved the zoning of Advocate's property as a planned development for the operation of the hospital, which was designated as "Planned Development #19." In April 1997, Advocate submitted a request to the Village for approval of an amended and final planned development site plan for Planned Development No. 19 to permit the construction of the Wellness Center. On April 8, 1997, the Village's plan commission held a public hearing on the request. At the conclusion of the hearing, the plan commission voted to recommend the approval of the amended planned development to the village council. In its findings, the plan commission noted that the IDNR had already conducted and concluded its consultation relating to the project. On May 22, 1997, the village council passed an ordinance approving the amended planned development. The Village itself did not consult with the IDNR before granting its approval.

The Board also subsequently issued a certificate of need to Advocate, thereby permitting it to operate the Wellness Center as a medical facility. The Board did not engage in a consultation with the IDNR before issuing the certificate of need.

On August 4, 1997, Alliance filed a complaint for *mandamus* against the Village, the Board, Advocate, Citadel Properties Oak Brook L.L.C., and the IDNR. Alliance is an organization that works to protect natural areas in Downers Grove. In its complaint, Alliance alleged that, under section 17 of the Act, both the Village and the Board were required to consult with the IDNR concerning the environmental impact of the project and had failed to do so. Alliance sought a writ of *mandamus* compelling the Village and the Board to participate in the consultation and also sought a temporary restraining order and preliminary injunction against Advocate and Citadel Properties Oak

Brook L.L.C. from commencing construction until the consultation had taken place.

Each of the defendants subsequently moved to dismiss the complaint pursuant to section 2—619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2—619 (West 1996)). All of the defendants argued that the action was moot because the consultation required by section 17 of the Act had already taken place. In addition, both the Village and the Board argued that they were not obligated to participate in the consultation process because the Wellness Center was not a project that had been "authorized, funded, or carried out" by an agency of state or local government as provided by section 17 of the Act (525 ILCS 30/17 (West 1996)).

On November 7, 1997, following argument, the trial court granted the defendants' motions and dismissed the complaint. In its ruling, the trial court did not reach the defendants' mootness argument. Instead, the trial court found that the matter turned on the interpretation of the language contained in section 17. The trial court explained:

"The [Act] in section 17 refers to projects that are *** 'authorized, funded, or carried out by,' *** the agency of the State or local government.

\* \* \*

I think the operative word here is 'authorized.' I believe that mandamus would only lie if the interpretation of the word 'authorized' included the zoning process.

*** I realize this is a case of first impression. I don't believe there has ever been any explication of what the word 'authorization' means in this context, but I think the clear legislative history and the legislative intent dictate that this Court find that the authorization contemplated by these actions, or by these statutes does not include the zoning procedure."

The trial court therefore ruled that section 17 did not require the Village or the Board to participate in a consultation concerning the Wellness Center. Following the denial of its motion to reconsider, the Alliance filed a timely notice of appeal.

On appeal, Alliance argues that the trial court erred in determining that the Village and the Board were not required to participate in the IDNR consultation relating to the Wellness Center. Specifically, Alliance contends that the Village's and the Board's actions in evaluating and approving the construction of the Wellness Center constituted an "authorization" for purposes of section 17 of the Act.

As they did before the trial court, the defendants argue that the consultation required by section 17 of the Act has already taken place

and therefore the instant appeal is moot. The defendants argue that the IDNR has already evaluated the potential adverse environmental effects that may be caused by the proposed project, has made recommendations to minimize those adverse effects, and has determined that the required consultation was conducted and completed. The defendants note that the results of the consultation were expressly considered by the Village's plan commission in its review of Advocate's proposed amendment to its planned development. Additionally, the defendants argue that the Village has no direct control over the design of this private project other than to ensure compliance with the applicable Village ordinances. The defendants conclude that it would be a waste of time and resources to require the Village and the Board to engage in another consultation.

The IDNR also argues that the instant appeal is moot for these same reasons. However, the IDNR nonetheless requests that we reach the merits of the instant appeal, arguing that an interpretation of section 17's statutory language would be of substantial public interest. The IDNR requests that we adopt the interpretation of section 17 advanced by Alliance, specifically, that local zoning decisions constitute actions "authorized" by local government. The IDNR argues that, because the Village here approved a project that was likely to have an adverse environmental impact, it should have consulted with the IDNR before allowing the amendment to Advocate's planned development.

■ We first address the question of mootness. The function of a reviewing court is to decide controverted issues between real parties. *Richardson v. Rock Island County Officers Electoral Board*, 179 Ill. 2d 252, 256 (1997). An appeal is considered moot when it " 'presents or involves no actual controversy, interests or rights of the parties, or where the issues have ceased to exist.' " *First National Bank v. Kusper*, 98 Ill. 2d 226, 233 (1983), quoting *People v. Redlich*, 402 Ill. 270, 278-79 (1949). The test for mootness is whether the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant the complaining party effectual relief. *In re A Minor*, 127 Ill. 2d 247, 255 (1989). Actions will be dismissed as moot once the plaintiffs have secured what they have basically sought, whether the relief is obtained through the action itself or independently. *Wheatley v. Board of Education of Township High School District 205*, 99 Ill. 2d 481, 485 (1984).

In order to determine whether this case is moot, we must examine the pleadings. In its complaint, Alliance requested (1) an order of *mandamus* compelling the Village and the Board to engage in a consultation with the IDNR as required under section 17 of the Act;

(2) a declaration that the Village ordinance approving the amendment to Advocate's planned development to allow for the construction of the Wellness Center was void; and (3) a temporary injunction barring any construction or preliminary site preparation work on the project until full compliance with section 17 had been effectuated.

■ As the defendants correctly note, an IDNR consultation examining the environmental impact of the project has already been conducted and closed. However, that consultation only involved Advocate; neither the Village nor the Board took part. As noted above, the gravamen of Alliance's complaint was that the Village and the Board violated section 17 by failing to participate in the consultation. One remedy that Alliance sought was an order compelling the Village and the Board to engage in the consultation process with the IDNR. As neither the Village nor the Board has participated in the consultation process, Alliance has not secured the relief sought in its complaint. Additionally, as the Village and Board continue to deny any obligation to participate, there clearly remains a controverted issue between the parties. For these reasons, we do not believe that the instant appeal is moot. See generally *In re A Minor*, 127 Ill. 2d at 255.

As additional support for their mootness argument, the defendants contend that it would be wasteful to require the IDNR to conduct another consultation on the project. Specifically, the defendants argue that the IDNR has already had an opportunity to evaluate the project and that its recommendations would not have been any different had the Village or the Board participated in the consultation. The defendants argue that the Village has no direct control over the project and cannot require Advocate to redesign the project to conform to IDNR's recommendations. However, we decline the defendants' invitation to speculate how the consultation procedure would have been affected by the Village's and the Board's participation. Rather, for the reasons stated above, we believe that Alliance's complaint requires us to determine whether the Village and the Board were in fact legally obligated to participate in the consultation and, if so, to compel such participation.

■ Turning to the merits, we initially note that the purpose of a section 2—619 motion is to provide a means to dispose of issues of law or easily proved issues of fact. *Nikolic v. Seidenberg*, 242 Ill. App. 3d 96, 98 (1993). The motion should be granted if, after construing the documents in the light most favorable to the nonmoving party, the court finds that no set of facts can be proved that would entitle the plaintiff to recover. *Nikolic*, 242 Ill. App. 3d at 99. When reviewing the propriety of a section 2—619 dismissal, all well-pleaded facts alleged in the complaint are taken as true. *Nikolic*, 242 Ill. App. 3d at 99. As

such, the reviewing court is concerned solely with a question of law presented by the pleadings and the standard of review is *de novo*. *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 21 (1997). This type of review is independent, and the appellate court is not required to defer to the trial court's reasoning. *Nikolic*, 242 Ill. App. 3d at 99.

Section 17 of the Act provides, in pertinent part:

> "All public agencies shall recognize that the protection of nature preserves, buffer areas and registered areas is the public policy of the State and shall avoid the planning of any action that would adversely affect them.

> It shall be the public policy of each agency of State or local government to utilize its authority in furtherance of the purposes of this Act, and to evaluate, through a process of consultation with the [IDNR], whether the actions, including capital projects, that are authorized, funded or carried out by the agency of State or local government are likely to result in the destruction or adverse modification of any natural area that is registered under this Act or identified in the Illinois Natural Areas Inventory." 525 ILCS 30/17 (West 1996).

Under this statutory language, the Village and the Board were obligated to consult with the IDNR only if they "authorized, funded, or carried out" the construction of the Wellness Center. The parties agree that the Village and the Board did not "fund" or "carry out" the project. Therefore, the question becomes whether the Village's act of approving Advocate's request for an amendment to its planned development was an "authorization" for purposes of the statute. Similarly, we must decide whether the Board's issuance of a certificate of need to Advocate can be considered an "authorization" of the project under the Act.

■ As correctly noted by the trial court, this is a question of first impression. Unfortunately, the term "authorized" is not defined by the Act. In interpreting the meaning of a statute, our primary concern is to ascertain and give effect to the true intent of the legislature. *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997). The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. *Paris*, 179 Ill. 2d at 177. The statute should be evaluated as a whole, with each provision construed in connection with every other section. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 91 (1992). We must also consider the reason and necessity for the law, the evil to be remedied, and the object to be obtained by the statute. *Schuttler v. Ruark*, 225 Ill. App. 3d 678, 683 (1992). A statute capable of two interpretations should be given that which is reasonable and which

will not produce absurd, unjust, or unreasonable results that the legislature could not have intended. *Schuttler*, 225 Ill. App. 3d at 683.

■ The word "authorize" has been defined as "[t]o empower" or "to give a right or authority to act." Black's Law Dictionary 122 (5th ed. 1979), citing *People v. Young*, 100 Ill. App. 2d 20, 23 (1968). The term has also been defined as "to permit a thing to be done in the future." See *Midland Iron & Steel Corp. v. Chicago, Rock Island & Pacific Ry. Co.*, 4 Ill. App. 3d 369, 371 (1972).

Using these definitions, both Alliance and IDNR argue that the Village authorized the construction of the Wellness Center, as the Village gave permission for the construction by approving the proposed amendment to Advocate's planned development. Moreover, because the Wellness Center was a "health facility," Alliance argues that the Board's granting of a certificate of need was a prerequisite to the construction and therefore an authorization under the Act.

■ As for the Board's role in issuing the certificate of need, we do not believe that such action constituted an "authorization" for purposes of section 17 of the Act. Consistent with the Board's statutory mandate, the issuance of a certificate of need simply represented a determination that there was an identifiable need for this health facility in light of several factors, including the community's population, the number of existing medical facilities, the extent to which those facilities are used, and the availability of medical personnel. 20 ILCS 3960/12 (West 1996). Although the certificate of need was necessary for the operation of the Wellness Center as a medical facility, it was not necessary for the construction of the building itself. The Board played no role in the planning or design of the Wellness Center and had no authority to control Advocate's decisions in this regard. We therefore conclude that the Board's function is not the type of "authorization" envisioned by section 17 of the Act.

■ We therefore turn to the more complicated issue of the Village's role in approving the amendment to the Advocate's planned development. As noted above, the term "authorize" means "to empower" or "to give a right or authority to act." If this term were the sole language used in the statute, we might be compelled to agree with the plaintiffs and the IDNR that the Village's approval of the amendment constituted an "authorization" of the project. However, the legislature prefaced the use of this term with a declaration of policy that public agencies should avoid the "planning" of any action that would adversely affect nature preserves, buffer areas, and registered areas. See 525 ILCS 30/17 (West 1996). The word "planning" has been defined as "to form a scheme or program for the accomplishment or attainment of a specific aim and purpose." American Heritage Dictionary 1044 (3rd ed. 1993).

We believe that the legislature's use of the word "planning" in the preface of section 17 prevents us from adopting the broad dictionary definition of the term "authorize" advocated by the plaintiffs and the IDNR. As noted above, the term "planning" would seem to require that the state agency or local government have a role in "forming" the particular scheme or program. We believe that such a role clearly requires more active participation in the action than that which would satisfy the traditional dictionary definition of the term "authorize." As noted above, we are obliged to construe a statute as a whole and seek to give effect to the legislature's intent in enacting the statute. See *Abrahamson*, 153 Ill. 2d at 91; *Schuttler*, 225 Ill. App. 3d at 683.

Therefore, after construing the statute's provisions as a whole, we conclude that the legislature's use of the word "authorize" was not meant to encompass the type of action taken by the Village in the instant case. Specifically, we do not believe that the Village's approval of a proposed amendment to a planned unit development constitutes the type of "planning" envisioned by the legislature in the preface of section 17. The Village clearly was not responsible for the decision to develop, plan, or construct the Wellness Center.

Rather, we believe that the Act was meant to apply only to an action in which the state agency or local government is a more active participant in the process. We believe that such active participation requires that the state agency or local government have a direct role in either the planning, design, funding, construction, or carrying out of the action. A municipality's role in enforcing its zoning ordinances or in granting approval to a proposed amendment to a planned development on private property does not rise to this requisite level of active participation.

As support for our conclusion, we note that the legislature only included governmental agencies in the consultation process required by section 17. Had the legislature intended to include private projects within the scope of actions covered by section 17, it would seem reasonable that the legislature would have required the private parties planning such projects to participate in the consultation process. This is especially true given the fact that the legislature expressly required that the consultation should occur "early in the planning of a proposed action." 525 ILCS 30/17 (West 1996). Here, the Village did not get involved until very late in the planning process; indeed, Village approval was the last step prior to actual construction. If the legislature had intended to include private projects within the scope of section 17, the inclusion of private parties in the consultation process would have greatly facilitated the process and maximized its effectiveness.

Moreover, the legislative history of the Act also supports our

conclusion that the consultation process was intended to apply only to those actions in which the government plays a direct role in either the planning, design, funding, construction, or carrying out of the action. During the Senate debate on this legislation, Senator Severns made the following comments:

"I also rise in strong support of this bill. *** [I]t's based on the simple principle that projects funded with public dollars should not destroy the public's heritage of natural prairies, lakes, forests, if other alternatives exist. I think it's a good bill, and I know of no opposition, and would urge strong support." 88th Ill. Gen. Assem., Senate Proceedings, April 15, 1993, at 119-20 (statements of Senator Severns).

We agree with the Village and the Board that such a comment reflects the legislature's intent that section 17 apply only to actions in which there is direct governmental involvement. Indeed, based on our review of the available legislative history, we can find no evidence indicating that the consultation procedure set forth in section 17 was intended to include the type of action taken by the Village in this particular case.

■ In support of its position, Alliance relies on certain administrative regulations promulgated by the IDNR that require consultations for local zoning decisions affecting private property that may have an adverse environmental impact. Specifically, such regulations require consultation in the context of land use decisions that involve "preliminary plats, plans and permits" or "an application for rezoning from a non-urban classification to an urban classification (e.g. from agricultural to residential) or a change from one urban classification to another on land not used in its entirety for the original classification." 17 Ill. Adm. Code §§ 1075.30(a)(7), (a)(8) (1996).

At the outset, we note that none of these events occurred here. The Village was not asked to approve preliminary plats, plans, or permits but instead was requested to approve an amendment to Advocate's planned unit development. In granting this request, the Village did not have to amend or alter the existing zoning for the property. However, even if such a zoning amendment was required, we note that section 1075.30(c)(8) of the Illinois Administrative Code specifically exempts from the consultation process "change of zoning requests for land currently zoned, developed, and used in its entirety for commercial, industrial or residential purposes." 17 Ill. Adm. Code § 1075.30(c)(8) (1996). Therefore, based on the IDNR's own regulations, we do not believe the Village was obligated to participate in the IDNR consultation.

Moreover, as the Village correctly notes, an administrative agency

may not use its rules and regulations to expand the scope of a piece of legislation to include requirements not found in the statute. *Pekin Memorial Hospital v. Department of Public Aid*, 273 Ill. App. 3d 259, 262 (1995). As already discussed, we do not believe that the legislature intended to impose the affirmative obligation upon local governments to engage in consultations every time they grant approval to the construction of private projects on private property. To the extent that the IDNR's regulations so require, we believe that the IDNR has exceeded its authority under the Act.

■ Alliance and the IDNR also rely on a number of federal authorities in support of their interpretation of the Act. See, *e.g.*, *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173, 57 L. Ed. 2d 117, 133, 98 S. Ct. 2279, 2291 (1978); *State of Idaho By & Through Idaho Public Utilities Comm'n v. Interstate Commerce Comm'n*, 35 F.3d 585, 596-97 (D.C. Cir. 1994) (hereafter *ICC*); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-56 (9th Cir. 1994). These authorities discuss section 7(a)(2) of the Endangered Species Act (16 U.S.C. § 1536(a)(2) (1994)), upon which section 17 of the Act is apparently based. Under the Endangered Species Act, every federal agency is required to engage in a consultation with the Department of the Interior prior to "any action authorized, funded, or carried out by such agency" that may jeopardize endangered species. 16 U.S.C. § 1536(a)(2) (1994). Federal courts have construed this language broadly and have required consultation for private activities "authorized" by federal agencies whether on public land or private property. See *ICC*, 35 F.3d at 596-97 (approval of abandonment of private rail line); *Pacific Rivers Council*, 30 F.3d at 1054-56 (approval of plans for timber sales and private roads on governmental land).

While we acknowledge the broad interpretation given by the federal courts to the Endangered Species Act, we do not believe these authorities are helpful in construing section 17 of the Act. Unlike the Endangered Species Act, which applies only to actions of governmental agencies, section 17 also incorporates actions "authorized, funded, or carried out" by local government. None of these federal authorities have considered the consultation obligations arising out of a municipality's role in enforcing its zoning and construction regulations. Additionally, each of these cases involved significantly greater governmental action than what is at issue in the instant case. See *ICC*, 35 F.3d at 588-90 (ICC authorized the abandonment of a 71-mile railroad line and the salvage of rails in the polluted railbed); *Pacific Rivers Council*, 30 F.3d at 1052-53 (Forest Service approved 15-year plan for the sale of timber and construction of roads on government lands); *Riverside Irrigation District v. Andrews*, 758 F.2d 508, 510-11 (10th Cir. 1985)

(Army Corps of Engineers refused to issue permit for initial dredging of a dam).

Rather, for the reasons already discussed, we conclude that the Village's and the Board's conduct in the instant case did not constitute an "authorization" for purposes of the Act. We believe that the consultation obligations under section 17 only arise in instances when government plays a more direct role in either the planning, design, funding, construction, or the carrying out of the proposed action.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

HUTCHINSON, J., concurs.

JUSTICE BOWMAN, specially concurring in part and dissenting in part:

I agree with the majority's ruling that this appeal should not be dismissed as moot because there clearly remains a controverted issue between the parties. Assuming the case is moot, I believe the court should nevertheless address the legal questions raised because they present a question of substantial public interest (*Lucas v. Lakin*, 175 Ill. 2d 166, 170 (1997); *Bonaguro v. County Officers Electoral Board*, 158 Ill. 2d 391, 395 (1994)).

The circuit court erred in narrowly interpreting section 17 not to include the Village's zoning decision approving Advocate's planned development (PD) or the Board's decision to issue a certificate of need for the Wellness Center. The Village had an obligation to consult with the IDNR under section 17. Because the Village's zoning decision authorized Advocate to proceed with construction likely to have an adverse impact on a natural area (525 ILCS 30/17 (West 1996)), the Village was required to engage in consultation with the IDNR. As the Village's zoning decision "authorized" the construction of the Wellness Center and the Board's decision to issue the certificate of need "authorized" the building's use as a health facility, these were unquestionably "actions *** authorized *** by" state or local government under section 17 of the Act.

Section 17 is clear on its face. That section applies to "the actions, including capital projects, that are authorized, funded, or carried out by [an] agency of State or local government." 525 ILCS 30/17 (West 1996). Illinois courts have held the word "authorized" to mean "given or endowed with authority" or "legally or duly sanctioned." *In re Disconnection of Certain Territory from the Sanitary District*, 111 Ill.

App. 3d 339, 344 (1982); see also *People v. Shinn*, 5 Ill. App. 3d 468, 472 (1972). These meanings are similar to the definition of "authorized," *i.e.*, "endowed with *** [or] sanctioned by authority," provided in the standard dictionary regularly relied upon by this court (Webster's Third New International Dictionary 147 (1986)). Based on the meanings associated with the term "authorized" and on the explanation given in Black's Law Dictionary that " '[a]uthorized' " may be construed as meaning " 'permitted' " or " 'directed' " (Black's Law Dictionary 133 (6th ed. 1990)), I would find that section 17 encompasses the decisions of the Village and the Board in this case. Here, the Village "authorized" the construction of the Wellness Center because the Village gave permission for the construction by approving the amendment to Advocate's planned development. No construction could have occurred without that approval. Because the Wellness Center was a "health facility," it was necessary for the Board to grant a certificate of need. See 20 ILCS 3960/5 (West 1996). Therefore, the construction of the building and its use as a health facility were "actions *** authorized *** by" (525 ILCS 30/17 (West 1996)) these agencies because the actions were "legally or duly sanctioned" by them (*In re Disconnection*, 111 Ill. App. 3d at 344).

The majority relies on its definition of the term "planning" in the first paragraph of section 17 to conclude that the legislature's use of that term precludes this court from adopting the broad dictionary definition of the term "authorized" advocated by plaintiffs and the IDNR. The majority, however, has not gleaned its definition of planning from the dictionary normally employed by this court but, instead, looks to another source. Based upon this court's past reliance on Webster's Third New International Dictionary, the majority should have used the definition of planning set out in that dictionary, *i.e.*, "the act or process of making or carrying out plans," specifically, "the establishment of goals, policies, and procedures for a social or economic unit." Webster's Third New International Dictionary 1731 (1986). In light of this definition, I believe the language "planning of any action" in section 17 refers, in particular, to those actions undertaken by a governmental agency, whereas the language "the actions *** authorized" by a governmental agency, as set forth in the second paragraph of section 17, refers to the actions of not only public agencies but also other parties. Moreover, the use of "shall" in that paragraph indicates the mandatory nature of the consultation process. See *Village of Winfield v. Illinois State Labor Relations Board*, 176 Ill. 2d 54, 64 (1997) (use of the word "shall" in a statute generally indicates a mandatory obligation). By not engaging in a consultation with the IDNR concerning the environmental impact of Advocate's project prior to authoriz-

ing the action, the Village did not comply with the legislature's intent in enacting section 17.

Based upon my interpretation of the terms "planning" and "authorized," I believe the language of section 17 is clear. Therefore, under the rules of statutory construction, no further analysis is required. The cardinal rule of statutory construction is to ascertain and give effect to the true intent of the legislature. *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997). The best indicator of that intent is the language used in the statute itself (*In re A.P.*, 179 Ill. 2d 184, 195 (1997)), which must be given its plain and ordinary meaning. *Paris*, 179 Ill. 2d at 177. Because the language is clear, no construction is necessary as permitted. The statute must be given effect as written without resort to legislative history if the meaning of the provision can be determined from its text (*Nevitt v. Langfelder*, 157 Ill. 2d 116, 134 (1993)) and without reading into the statute "exceptions, conditions, or limitations that the legislature did not express" (*Moon v. Smith*, 276 Ill. App. 3d 958, 962 (1995)). As the plain language of section 17 is clear, we need not resort to other interpretive aids to ascertain legislative intent.

To support its decision, the majority cites a comment by Senator Severns from the legislative debate about projects "funded with public dollars" and another exchange in the Senate about private properties. 302 Ill. App. 3d at 298. However, where a statute is clear on its face, a basic rule of statutory construction "forbids a court to canvass legislative history for evidence of legislative intent." *Nevitt*, 157 Ill. 2d at 134. Because section 17 is clear (and the majority nowhere describes how it is ambiguous), no examination of the legislative history is proper. Additionally, Senator Severns' remark regarding section 17 reflected the view of a single legislator. Isolated statements from floor debates standing alone are insufficient to establish legislative intent. *Old Ben Coal Co. v. Human Rights Comm'n*, 150 Ill. App. 3d 304, 307 (1986). Most important, the reference by Senator Severns to "projects funded with public dollars" (302 Ill. App. 3d at 298) is inconsistent with the language of section 17 itself, which also mentions actions "authorized" or "carried out" by the government. Comments by legislators are an aid to construction only when consistent with the statutory language. 2A N. Singer, Sutherland on Statutory Construction § 48.13, at 356 (5th ed. 1992).

Even assuming section 17 is ambiguous in some respect, I would, contrary to the majority's position, rely on the decisions of the federal courts that have interpreted the meaning of "actions *** authorized, funded, or carried out by" agencies of state or local government. That phrase, as well as the consultation procedure of section 17 itself, was

drawn from identical provisions providing for consultation under section 11(b) of the Illinois Endangered Species Protection Act (520 ILCS 10/11(b) (West 1996)). Section 11(b) requires consultation relating to "actions authorized, funded or carried out by" agencies of local government. 520 ILCS 10/11(b) (West 1996). This provision of the Illinois Endangered Species Protection Act was based on section 7(a)(2) of the federal Endangered Species Act (16 U.S.C. § 1536(a)(2) (1994)). That section applies to every agency and to "any action authorized, funded, or carried out by such agency" (hereinafter referred to as agency action) (16 U.S.C. § 1536(a)(2) (1994)).

The federal courts have repeatedly been called upon to interpret the statutory language of section 7(a)(2) of the federal Endangered Species Act. Their decisions confirm that the language is both clear and broad. See *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 57 L. Ed. 2d 117, 98 S. Ct. 2279 (1978). The Supreme Court observed that "[o]ne would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act" and declared that "[t]his language admits of no exception." *Tennessee Valley Authority*, 437 U.S. at 173, 57 L. Ed. 2d at 133, 98 S. Ct. at 2291. Lower federal courts "have also construed 'agency action' broadly." *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994); *Lane County Audubon Society v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992). They have required consultation under section 7 not only for projects "carried out" by the government but also for private activity "authorized" by the government. See, *e.g., Pacific Rivers Council*, 30 F.3d at 1054-55; *Pyramid Lake Paiute Tribe of Indians v. United States Department of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).

When an Illinois statute is modeled after a federal statute, federal decisions construing the federal statute should be used in interpreting our statute. *County of Kane v. Illinois State Labor Relations Board*, 165 Ill. App. 3d 614, 620 (1988). Consequently, assuming ambiguity, I would also rely on the interpretation given by the federal courts to section 7 of the federal Endangered Species Act as an aid in interpreting the language in question in section 17 and conclude that, under section 17, the Village was required to engage in consultation with the IDNR concerning the environmental impact Advocate's construction of the Wellness Center would have on adjacent Lyman Woods.

Accordingly, for the reasons stated, I would reverse the judgment of the circuit court of Du Page County.